AT THE

## NOVEMBER SESSION 1866, IN BOSTON.

PRESENT:

HON. GEORGE T. BIGELOW, CHIEF JUSTICE.
HON. EBENEZER R. HOAR,
HON. REUBEN A. CHAPMAN,
HON. HORACE GRAY, JR., } JUSTICES.
HON. DWIGHT FOSTER,
HON. JOHN WELLS,

## SUFFOLK COUNTY.

### CHARLOTTE C. CLUFF vs. MUTUAL BENEFIT LIFE INSURANCE COMPANY.

If a policy of life insurance contains a clause providing that the policy shall be void in case the insured shall die in the known violation of any law of these states, or of the United States, or of any country which he may be permitted under this policy to visit or reside in, the company must prove, in order to avoid the policy on this ground, that he died while engaged in a voluntary criminal act, known by him at the time to be a crime against the laws of such state or country. But those acts which are criminal by the common law and the laws of all civilized countries will be presumed to be criminal by the laws of the states of this Union, and he will also be presumed to have known that they are so.

If, in an action upon such policy, there is evidence tending to show that the insured was killed by being shot while engaged in the commission of a robbery and assault and battery, and it is in dispute whether, if he had been so engaged, he had desisted therefrom, it must appear, in order to exonerate the company from liability, that such criminal act was not so far completed as to render the shooting a new and distinct event, rather than a mere continuation of the original affray, and that the death was in consequence of the crime of the insured; but it need not be proved that the insured knew or had reason to believe that his criminal act would or might expose his life to danger.

Cluff *v.* Mutual Benefit Life Insurance Company.

CONTRACT upon a policy of life insurance, by which the defendants insured the life of Matthew J. Cluff, the plaintiff's husband, in the sum of $3000, payable to the plaintiff, or, if she should die before him, to their children. The policy contained the following clause :

" Or in case he " (the insured) " shall die by his own hand, in or in consequence of a duel, or by reason of intemperance from the use of intoxicating liquors, or by the hands of justice, or in the known violation of any law of these states, or of the United States, or of the said provinces, or of any other country which he may be permitted under this policy to visit or reside in, this policy shall be void, null and of no effect."

At the trial in the superior court, at April term 1865, before *Brigham*, J., the plaintiff proved that she duly notified the defendants of her husband's death, and introduced no other evidence except two depositions, the material portions of which were as follows :

Frank Bugbee, a physician, of the parish of Ascension and state of Louisiana, testified that Cluff was killed on the 25th of February 1864, on the Doyle plantation in that parish ; and on cross-examination he answered thus :

1. " He died from a pistol shot wound, fired from the hands of William Cox. Mr. Cluff had been away from his home for a couple of days before the day of his death, and returned about four o'clock in the afternoon. Shortly after his return he and I went in company to the Doyle plantation. We were sitting on our horses, on the levee, when William Cox, a boy, drove along with a load of water. Mr. Cluff asked me who that boy was. I told him it was a Cox boy. He asked the boy when they were going to leave the place. The boy answered, they were going soon. Mr. Cluff asked the boy when they were going to pay the bill. The boy answered, ' they were not going to pay it all.' Mr. Cluff said, ' I will take your horse then.' The boy dared him to do it, and to try it then. Mr. Cluff then went unhitching the horse from the wagon. After having partly unhitched, he tried to get the reins or ropes from the boy. The boy then got down from the wagon, by the side of Cluff. Cluff

then took a small pen-knife to cut the ropes. The boy said Don't do that.' Mr. Cluff then got [*sic.*] the ropes. The boy then ran about three rods, drew a pistol, fired at Mr. Cluff, and shot him in the right side between the fifth and sixth ribs. The boy then cocked his pistol again, but did not fire. Mr. Cluff said to me, ' He has hit me, doctor,' and never spoke afterwards, and died immediately." 2. " Cluff was in the act of taking the horses from the wagon in which the boy who killed him was. He had not taken any other property in his control." 3. " Mr. Cluff did not assault said boy otherwise than by unhitching his horses. He did not beat him, nor did he threaten him, just before he was shot, only to the taking of his horses." 4. " The bill Cluff talked of was a bill for feed for the horses and cattle of the Coxes, used by them from the plantation of which said Cluff was the lessee." 5. " He [Cox] was, as near as I could guess, from sixteen to eighteen years of age. He was, as near as I could say, about five feet three inches high, and weighing about one hundred and ten pounds." The witness also testified, in answer to further inquiries, that Cox was tried for the offence, and acquitted.

William Scott, an engineer, of the parish of St. Charles, in Louisiana, after stating the fact of the killing, testified as follows :

*Int.* 5. " I was present at the time he was shot. William Cox was coming along in a wagon, having a load of water. Dr. Bugbee and Matthew J. Cluff were standing on the levee in front of the gate at Mount Houmo plantation. Cluff asked the doctor who that was that had the wagon. The doctor told him it was William Cox. Mr. Cluff then called Cox and told him to halt with his wagon. When Cox halted his wagon, Mr. Cluff asked him when was he going to move. Cox said he had moved some of their things ; and then Mr. Cluff asked him when he was going to finish moving. Cox said he did not know ; when he got ready. Then Mr. Cluff asked him where he was moving to. Cox said, to Baton Rouge. Mr. Cluff then asked Cox when was he going to pay the bill that he sent in to him. Cox said he was not going to pay it all. Mr. Cluff

then said, ' You are not going to pay it at all ? ' Cox said, ' No, sir, I am not.' Mr. Cluff then said, ' You have got some stock, hain't you, some horses and cattle ? ' Cox said, ' Yes.' Cluff then says, ' Well, if you won't pay the bill, I will take your horses and cattle to pay it.' Cox then said, ' You better get at it now.' Mr. Cluff got off the levee and went down on the road where Cox was, and unhitched both horses out of Cox's wagon, and then went up to the wagon, and told Cox to turn loose the lines. Cox said he would not do it. Then Mr. Cluff pulled out a little pen-knife about three inches long and started to cut the lines of the wagon, and Cox then told Cluff not to cut his lines. Cluff then shut the knife up, and put it in his vest pocket, and went up to the horses' heads and started to untie the lines from the bridle. By that time Cox left the wagon and went up to the horses' heads where Cluff was, and then grabbed Mr. Cluff by the throat. Mr. Cluff then struck Cox and knocked him off from him, making Cox a sort of staggering on his all fours. Then Cox run off about three strides behind the wagon, and drew out his pistol and fired at Cluff. Mr. Cluff then dodged round the horses' heads to keep himself from getting the second fire. William Cox tried to get the second fire at him, until he heard Cluff halloa out to the doctor, saying he was struck. At this time William Cox whirled and run. Cluff then fell. The doctor run to him and found him dying, and so near gone he could not do him any good." *Int.* 6. " Cluff did assault Cox, after Cox caught him by the throat."

On cross-examination, this witness added some statements, the material ones of which are as follows : 8. " Cluff did not threaten said Cox." 9. " Cluff's conduct and language were not violent and threatening towards said Cox." *Int.* 10. " When said Cluff was shot, was not an open knife in his hand ? " *Ans.* " No." 11. " Cox was about three strides, say about three yards, behind the wagon, and said Cluff was at the horses' heads Cluff was not facing Cox, nor approaching him with an open knife in his hand, nor approaching him at all." 12. " He was not then threatening him ; he was not saying anything." He further testified that he thought Cluff was about forty years old.

The defendants offered no evidence; and the judge instructed the jury that, upon the evidence, the defendants were liable as matter of law; and a verdict was accordingly returned for the plaintiff. The defendants alleged exceptions.

*C. W. Loring*, for the defendants.

*H. C. Hutchins & A. S. Wheeler*, for the plaintiff.

BY THE COURT. If it had been found by the jury that the insured, when he was shot, was engaged in a criminal violation of law, known by him to be so, and that such violation of law might have been reasonably expected to expose him to violence which might endanger life, the court are of opinion that the defence might have been sustained, and that there was evidence on this point, which should have been submitted to the jury.

Whether the defence can be maintained upon any other ground, no opinion is given.                    *Exceptions sustained.*

A new trial was accordingly had in the superior court, at April term 1866, before *Vose*, J., at which the same evidence was introduced as before, with the addition that the defendants cited the Rev. Sts. of Louisiana, 1856, p. 160, § 1, as follows: " All crimes, offences and misdemeanors shall be taken, intended and construed according to and in conformity with the common law of England ; and the forms of indictment, (divested, however, of unnecessary prolixity,) the method of trial, the rules of evidence, and all other proceedings whatsoever in the prosecution of the crimes, offences, and misdemeanors, changing what ought to be changed, shall be according to the common law, unless otherwise provided."

The defendants requested the court to instruct the jury as follows :

" 1. That the insured died in a known violation of the law, according to the terms of the policy, and that there was no sufficient evidence upon which a verdict could be found for the plaintiff.

" 2. That the insured's taking the horses from Cox forcibly, though under pretext or claim of collecting a debt, was robbery which Cox could resist even with the use of a deadly weapon, and the insured's death, while taking the horses, rendered the

policy on his life, according to its terms, void, null and of no effect.

" 3. That the taking of the property of another forcibly, and without legal process, is a known violation of the law which is referred to in the policy.

" 4. That there is no evidence upon which the jury can find that Cluff, in taking the horses, was in the exercise of any legal right. That the burden was on the plaintiff to show that Cluff supposed he had a right to take·the horses.

" 5. That the policy is void, null and of no effect, because the insured died while in the act of violating the law of the state he was in, and the laws of every civilized community, in taking property to which he had not any legal claim.

" 6. That, the dispute being brought on by the illegal act of the insured, the death of Cluff was in consequence of a known violation of law."

But the judge refused so to rule, but instructed the jury as follows :

" The burden of proving that the insured died in the known violation of law is upon the defendants. The attempt to dispossess Cox of his horses, if not accompanied by threats or acts of violence upon Cox, committed or uttered for the purpose of compelling him by force and terror to surrender possession of them, would not constitute the crime of robbery, or an attempt at robbery ; and if this attempt to take the horses was made by Cluff under the honest though mistaken belief that he had a legal right to take them to satisfy his claim, the act would not constitute either larceny or an attempt to commit that offence. In the absence of force or threats used by Cluff to induce Cox to give up the property, the acts of Cluff, if unlawful, constituted only a trespass or wrongful intermeddling with the personal property of Cox, for which he might have his remedy for damages ; but they did not constitute by the common law a criminal violation of law, subject to the penalty of fine or imprisonment, and, in the absence of any evidence that they were a violation of any penal statute of Louisiana, there is no legal presumption that they had any such criminal character. If when he was shot he

was engaged in a criminal violation of law, as in an attempt to commit the crime of robbery or larceny, or was committing an assault upon the person of Cox, and he knew he was so engaged in a criminal violation of law, and such violation might reasonably have been expected to expose him to violence which might endanger life, then he died in known violation of law within the meaning of the policy, and the plaintiff cannot recover. If when shot he was not actually engaged in an assault upon Cox, but this assault had ceased, and he was not threatening to renew it, and Cox had withdrawn from his reach, and under these circumstances Cox deliberately shot him, then he was not engaged in any criminal violation of law, so far as unlawful violence upon Cox was concerned, when he died."

The jury returned a verdict for the plaintiff; and the defendants alleged exceptions.

*Loring,* for the defendants. The act of Cluff, in taking the property of Cox from him forcibly, for the purpose of indemnifying or redressing himself, was a violation of law. It is so in every civilized or half-civilized country. The provision of the policy is general, and is not confined to criminal violations of law, but includes all violations of law. All violations of law are more or less dangerous to life, and especially trespasses upon land, property, or the person ; and life insurance companies may well guard against the effect of them. And this clause was intended for all deaths arising from the insured's known violation of law. See *Dean* v. *Amer. Mut. Life Ins. Co.* 4 Allen, 96 ; *Borrodaile* v. *Hunter,* 5 Man. & Gr. 639 ; *Amicable Society* v. *Bolland,* 4 Bligh, (N. S.) 194, and 2 Dow & Clark, 1. The insured's violation of law is a known violation everywhere. Some violations of law, depending on special statutes, are not known violations. But the presumption is conclusive that Cluff, being a responsible person, must have known that his act was in violation of law. Best on Presumptions, 63, 127.

Cluff's act amounted to robbery. 4 Bl. Com. 243, 244. The purpose of taking the horses is immaterial. The pretence that the family of Cox were indebted to him makes no difference in the character of the act. Being done by force, the act amounted

to robbery. See 2 East P. C. *c.* 16, §§ 127, 128; 1 Russell on Crimes, (7th Amer. ed.) 880–882; Woodfall Land. & Ten. (5th ed.) lib. 2, *c.* vii. § 10; *Commonwealth* v. *Low,* Thacher's Crim. Cas. 477. It is unnecessary to show that Cox was justified in killing Cluff, but the facts are sufficient even for that. 4 Bl. Com. 180. 1 Russell on Crimes, 667, 668. 2 Bishop Crim. L. § 632.

If not a robbery, Cluff's act was a trespass accompanied by a breach of the peace, indictable at common law and in Louisiana. 1 Bishop Crim. L. § 397. 3 Salk. 187.

The instructions which were requested should have been given; and the instructions which were given were incorrect. No threats or acts of violence upon Cox, committed or uttered for the purpose of compelling him by force or terror to surrender possession of them, were necessary to constitute robbery. In many cases robberies have been attended with great courtesy towards the robbed; but if the person robbed parts with his property through terror, it is enough. *Commonwealth* v. *Humphries,* 7 Mass. 242. There being no evidence to show that Cluff had an honest or mistaken belief that he had a legal right to take the horses, the instruction on this point was erroneous. The other instructions were too restricted. There is no clause in the policy requiring the violation of law to be criminal, or that it must reasonably be expected to endanger the life of the insured.

*Hutchins & Wheeler,* for the plaintiff. The witnesses gave different accounts of the transaction, and the case was therefore a proper one to be submitted to the jury under instructions. This having been done, the only questions here are in reference to the instructions given and refused.

The language of the policy must be construed to mean that, in order to avoid the policy, the insured must die in consequence of the known, intentional, guilty violation of the criminal law. There was no evidence of the laws of Louisiana, except of the general criminal laws of that state.

In this case, clearly, taking the two depositions together, it cannot be contended that the evidence proved any criminal

offence, unless robbery.   To constitute robbery, there must be either actual violence to the person, or putting in fear.   4 Bl. Com. 242.  2 Bishop Crim. L. §§ 967–971.  The burden of proof was on the defendants to establish one of those alternatives.   But the evidence negatives both of them.   The most, therefore, that can be considered as proved is, that Cluff was committing a trespass.

But even if Cluff was committing a robbery, Cox had no right to shoot him for the purpose of preventing it; 2 Bishop Crim. L. §§ 658, 634; and therefore the death of Cluff was not the natural consequence of his act, as being legally justifiable; nor can the taking of life be said to be a natural consequence of a mere trespass of the character of the act of Cluff.   Therefore a death so resulting could not be in consequence of the violation of law.   See *Harper* v. *Phœnix Ins. Co.* 19 Missouri, 506.

The verdict of the jury has decided that Cluff was not engaged in any criminal violation of law, unless the judge erred in defining robbery.

FOSTER, J.   In an action upon a policy of life insurance, the death of the insured having been shown, the defendant corporation relied, to avoid the contract, upon proof that a condition of the policy had been violated.   To establish this defence the burden of proof was upon the company, notwithstanding the evidence tending to prove a forfeiture came from the plaintiff's own witnesses.   The case could not be withdrawn from the jury, or a verdict for the defendant directed, because the defence rested upon an affirmative proposition which the company was bound to maintain.

In the opinion of the court, the condition that the policy should be null and void, among other grounds, in case the insured should die "by the hands of justice or in the known violation of any law" of the state or country where he resided or which he was permitted to visit, must be construed to refer to a voluntary criminal act on the part of the insured, known by him at the time to be a crime against the law of such state or country.   Applying the maxim *noscitur a sociis*, and remembering that such a clause ought not to be so interpreted as to work a

forfeiture unless that intention is apparent, as well as from the natural import of the words "known violation of law," we conclude that they do not extend to mere trespasses against property or other infringements of civil laws to which no criminal consequences are attached.

Robbery, larceny and an assault upon the person of another, which are criminal offences by the common law and the laws of all civilized countries, must be presumed to be crimes against the laws of Louisiana. And the ordinary presumption applies to this case, that every person intelligent enough to be the subject of punishment must be presumed to know the criminal laws of the government under the jurisdiction of which he is found.

The forcible taking of the horses from Cox, if done under an honest claim of right, however ill founded, would not constitute the crime of robbery or larceny; because where a party sincerely, although erroneously, believes that he is legally justified in taking property, he is not guilty of the felonious intent which is an essential ingredient of these crimes. Neither does the taking of horses from a vehicle to which they are harnessed amount to an assault upon the driver, unless accompanied by violence or threats of violence against him. An assault is an intentional attempt by force to injure the person of another. *Commonwealth v. Ordway*, 12 Cush. 270. A battery is committed whenever the menaced violence of an assault is done in the least degree to the person. Either an assault or battery would be a crime within the condition of the policy, unless justified as a measure of necessary self-defence.

To apply these principles more closely to the circumstances of the homicide of Cluff, as narrated in the depositions which were the only evidence at the trial, we find in the account given by Bugbee no statement of any assault committed by Cluff, previous to the firing of the pistol. He appears only to have endeavored to unharness and take away the horses, under his claim to hold them as security for debt, and neither to have done nor threatened any injury to the person of Cox.

In the deposition of Scott, however, a different account of the

transaction is given, according to which Cluff was guilty of an assault and battery. His attempt to take away the horses was forcibly resisted by Cox, who "grabbed him by the throat." Cluff then struck him, making him stagger. This blow does not appear to have been by way of self-defence, but in furtherance of the design to obtain the horses. It was therefore, according to the version of this witness, a criminal assault, even if Cox also committed an assault by using undue violence in resisting the attempt of Cluff.

But the jury may not believe the narrative of either deposition to be precisely accurate, and the question whether Cluff was guilty of an assault must be submitted to their consideration upon all the evidence which may be produced at another trial.

Assuming that Cluff did commit a criminal assault, it may not necessarily follow that he died in the known violation of law. If he was shot while the assault continued, such would be the case. But if it had ceased, and Cluff was not threatening to renew it, and Cox had withdrawn out of his reach and then shot him, not in the course of the affray, but merely to revenge himself for what had been done, or to prevent the seizure of the horses, then at the time he was killed Cluff was not engaged in a known violation of the law, within the meaning of the policy. For he must have received the mortal wound during and while engaged in the commission of a crime, not merely in consequence of it afterwards. But the jury, upon all the evidence, should consider whether, if he is proved to their satisfaction to have been once engaged in a criminal assault, he can be deemed to have desisted from it, while persisting continuously in the very act in the course of which the affray occurred. Their attention should be called distinctly to the question whether, if Cluff had committed a criminal assault, it was so far ended when he was fired upon that the fatal shot is to be regarded as a new and independent event, rather than a mere continuation of the original affray. If Cluff committed a criminal assault on Cox which the latter immediately returned by a fatal blow, then the death would have been occasioned in a known violation of law

although the jury might believe that Cluff was not at the moment intending to commit any further assault. The question to be considered is, were the two acts — the assault by Cluff and the firing of the pistol by Cox — a part of one conflict for the possession of the horses, or had Cox abandoned his attempt to retain the custody of the horses, and had Cluff desisted from his assault? Was the fight over, or had Cox merely retired to a more advantageous position? In short, if Cluff in the first instance did commit a criminal assault, and the firing of the pistol was a part of the same continuous transaction, then the condition of the policy was violated.

It must also appear that the death was caused or occasioned by or resulted from the criminal act. The loss of life must be connected with the crime as its consequence. By reason of the guilty act the death must have occurred, so that without its commission it would not have taken place.

In the opinion of a majority of the court, it is not, however, essential that the deceased should have known, or have had reason to believe, that his criminal act would or might expose his life to danger. The fact that the crime actually did produce the death is sufficient to avoid the policy, without regard to the probability that such a result would ensue.

Erasing from the instructions given by the learned judge at the trial the clause, " and he knew that such violation might reasonably have been expected to expose him to violence which might endanger life," the remainder appears to be correct, so far as reported. The jury should be instructed what acts constitute the crimes of robbery, larceny and assault upon the person. It is for them to decide whether, when shot, the deceased was engaged in committing or attempting either of these offences. If he had committed an assault, it is likewise to be determined by them whether he had ceased and desisted therefrom. Guided by instructions modified and amplified in conformity with the views expressed in this opinion, the question whether the policy has been forfeited by a violation of the condition will be for their determination. *Exceptions sustained.*